# Supreme Court of Florida

_____

No. SC2026-1162
_____

**WILLIAM FRANCES SILVIA,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

August 12, 2026

PER CURIAM.

Seventeen years after William Frances Silvia, was sentenced to death for capital murder, Governor Ron DeSantis signed his death warrant and set his execution date for August 18, 2026. Though he validly waived postconviction proceedings and discharged counsel in 2012, Silvia, through the same counsel that represented him in 2012—Capital Collateral Regional Counsel - Middle Region (CCRC-M)—filed a postconviction motion challenging his warrant. That motion was summarily denied, in part because of his prior waiver. For the reasons that follow, we affirm the postconviction court's

order and deny Silvia's request for oral argument and motion for stay.[1,2]

**I.**

On September 22, 2006, Silvia murdered his estranged wife, Patricia Silvia, and attempted to murder her mother, Betty Woodard. As we detailed in *Silvia v. State* (*Silvia I*), 60 So. 3d 959, 963-64 (Fla. 2011), Silvia had become homeless and lost his job, while Patricia and her two minor children from a previous marriage moved into the home of her mother and stepfather. On September 22, Silvia went to that home and, after arguing with Patricia, retrieved a shotgun from his vehicle and fired a total of seven shots, shooting both Patricia and her mother, Betty, in the head. Only Betty survived. Silvia also shot at the house and fired two rounds in the air while other people—who were there for a cookout—were around, including Patricia's minor son. Silvia later confessed to law enforcement that he shot Patricia "because she spent all of their money and then started dating her ex-husband." *Id.* at 964.

---

1. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const.

2. Silvia also filed a motion for stay of execution in case number SC2009-0220, which we also deny today by separate order.

- 2 -

Following the guilt phase, the jury convicted Silvia of one count of first-degree murder and one count of attempted first-degree murder. *Id.* During the penalty phase, the State proved three aggravating factors, that Silvia: (1) has a prior violent felony; (2) created a great risk of death to many persons; and (3) committed the murder in a cold, calculated, and premeditated manner. The jury voted 11-1 for the death penalty, and the trial court sentenced Silvia to death. *Id.* at 966-67.

We affirmed Silvia's convictions and death sentence on direct appeal. *Id.* at 963.

Silvia's postconviction history is brief. In 2012, based on Silvia's pro se letter to the circuit court—which was treated as a motion to dismiss his postconviction proceedings under Florida Rule of Criminal Procedure 3.851(i)—Silvia waived his right to postconviction proceedings and discharged counsel before counsel could finish discovery and file an initial motion challenging his judgment and sentence under rule 3.851(d). *Silvia v. State* (*Silvia II*), 228 So. 3d 1144 (Fla. 2013). Before granting Silvia's request to waive his postconviction proceedings and discharge counsel, the circuit court conducted a detailed colloquy and advised Silvia that

he would be permanently giving up any right to take advantage of any changes that may occur in the law, which Silvia said he understood. He also acknowledged that he still wished to waive postconviction counsel and postconviction proceedings even though his waiver would make him immediately eligible for a warrant. His counsel, CCRC-M, sought review, and this Court upheld the validity of Silvia's waiver and his right to discharge counsel. *Id.* at 1145-46.

Notwithstanding his waiver, several years later, Silvia filed a postconviction motion seeking relief under *Hurst v. State*, 202 So. 3d 40 (Fla. 2016), *receded from in part by State v. Poole*, 297 So. 3d 487, 507 (Fla. 2020), based on his nonunanimous penalty phase jury recommendation for death. *See State v. Silvia* (*Silvia III*), 235 So. 3d 349 (Fla. 2018). Although the circuit court granted Silvia a new penalty phase, this Court reversed on appeal and reinstated Silvia's death sentence, reasoning that "Silvia's valid postconviction waiver, which included his understanding that 'he was losing permanently his right to take advantage of any changes that may occur in the law,' preclude[d] him from claiming a right to the benefit of *Hurst*." *Id.* at 351-52 (quoting *Silvia v. State*, 123 So. 3d 1148 (Fla. 2013) (table)).

The following year, Silvia filed a demand for additional medical records pursuant to Florida Rule of Criminal Procedure 3.852(i), which the circuit court dismissed as premature. *Silvia v. State* (*Silvia IV*), No. SC2019-1778, 2020 WL 901912 (Fla. Feb. 25, 2020) (appeal voluntarily dismissed).

Finally, in 2022, Silvia filed an amended motion to appoint federal habeas counsel pursuant to 18 U.S.C. § 3599(a)(2) in the Tampa Division of the United States District Court for the Middle District of Florida. *Silvia v. Sec'y, Dep't of Corr.*, No. 8:22-cv-1365 (M.D. Fla. June 15, 2022). The case was later transferred to the Orlando Division where it was dismissed without prejudice to give Silvia "the opportunity to seek the reappointment of postconviction counsel in the state courts and to attempt to litigate exhaustible claims in the state courts." *Silvia v. Sec'y, Dep't of Corr.,* Order, at 3, No. 6:22-cv-1125 (M.D. Fla. Mar. 18, 2024).

On May 5, 2022, Silvia became eligible for postconviction counsel despite his 2012 discharge of counsel. *See* Fla. R. Crim. P. 3.851(i)(11) ("For cases where counsel was discharged before May 5, 2022, collateral counsel eligible under rule 3.112 must be appointed."); *In re Amends. to Fla. Rule of Crim. Proc. 3.851*, 351 So.

3d 574, 575-76 (Fla. 2022) ("[N]ew subdivision (i)(11) provides that collateral counsel must be appointed in cases for which motions under subdivision (i) were granted prior to the effective date of these amendments, i.e., where counsel was previously discharged.").

On July 17, 2026, Governor DeSantis signed a warrant scheduling Silvia's execution for August 18, 2026. CCRC-M was appointed to represent Silvia and proceeded to file demands for public records pursuant to rule 3.852. In his demands, Silvia sought records from the Florida Department of Corrections (FDOC) concerning the lethal injection protocols and, specifically, information on whether FDOC had a shortage of the first drug administered in the protocol, etomidate, and whether its supply of etomidate had expired. He also demanded records from the Executive Office of the Governor, specifically seeking internal communications concerning how he came to be selected as the next warrant candidate given that his counsel was currently representing another active warrant defendant, Dominick Occhicone. The postconviction court denied these requests.[3]

---

3. Silvia does not challenge these rulings on appeal.

CCRC-M then filed a successive postconviction motion under rule 3.851(h), raising two claims. First, counsel argued that the timing of Silvia's warrant—while CCRC-M was representing Occhicone in his active death warrant—violated Silvia's Eighth and Fourteenth Amendment rights, his corresponding rights under the Florida Constitution, and his "statutorily created right to counsel during postconviction hearings," whose assistance he argued must be effective. Second, counsel argued that an alleged shortage of etomidate will violate Silvia's Fourteenth Amendment right to equal protection and to be executed in the same manner as other death row inmates, as well as his right to due process.

Following a *Huff*[4] hearing on July 29, 2026, the postconviction court summarily denied Silvia's rule 3.851(h) motion, holding first that because Silvia validly waived all postconviction proceedings in 2012, his current motion was procedurally barred. The postconviction court alternatively considered each claim but found them to be legally insufficient or meritless.

Silvia now appeals the summary denial of his two

---

4. *Huff v. State*, 622 So. 2d 982 (Fla. 1993).

postconviction claims.  For the reasons explained below, we affirm the postconviction court's order and deny all other relief.

## II.

Our review of an order summarily denying a successive rule 3.851 motion is de novo.  *See Rogers v. State*, 409 So. 3d 1257, 1262 (Fla.), *cert. denied*, 145 S. Ct. 2695 (2025).  Summary denial is appropriate if "the motion, files, and records in the case conclusively show that the movant is entitled to no relief."  *Id.* (quoting *Zack v. State*, 371 So. 3d 335, 344 (Fla. 2023)).  A postconviction court may also summarily dismiss claims that are procedurally barred.  *See id.* (citing *Zack*, 371 So. 3d at 344, and Fla. R. Crim. P. 3.851(e)(2)).

## A.

We first address Silvia's 2012 waiver.  We agree with the postconviction court's conclusion that Silvia was permanently barred from collaterally attacking his judgment and sentence and availing himself of new developments in the law, *see Silvia II*, 228 So. 3d at 1145-46; *Silvia III*, 235 So. 3d at 351-52, including any favorable language in the comments concerning the 2022 amendments to rule 3.851(i), despite the requirement that he now

be given counsel under rule 3.851(i)(11). However, at Silvia's July 29 *Huff* hearing, the State agreed that Silvia could raise certain claims "solely attributing to the execution process." To the extent Silvia's two postconviction claims are limited to the circumstances of the execution process, we address these claims.

**B.**

### *Claim 1*

Silvia first asserts the postconviction court erred in summarily denying his claim concerning the timing of the warrant and its impact on CCRC-M's ability to effectively assist him while already assisting another defendant under an active death warrant, Occhicone. While Silvia acknowledges on appeal that there is no federal constitutional right to the effective assistance of postconviction counsel, he asserts that he has a state statutory right to effective assistance as evidenced by the requirement in section 27.711(12), Florida Statutes, for "quality representation," and the 2022 comments to the rule 3.851(i) amendment requiring competent counsel under Florida Rule of Criminal Procedure 3.112. He further argues that the deprivation of dedicated, effective counsel violated his Fourteenth Amendment and corresponding

Florida constitutional rights to due process and access to courts.

We rejected a nearly identical claim in *Barwick v. State*, 361 So. 3d 785, 790 (Fla. 2023) ("Barwick also alleges that the thirty-day warrant period and the difficult attendant circumstances identified by Barwick made it impossible for postconviction counsel to provide effective assistance, thereby violating what he claims is his 'statutory right to effective postconviction counsel.' "). There, we explained that the reference to "quality representation" in section 27.711(12)[5] "does not create a right to effective assistance of postconviction counsel" given the other provisions in chapter 27

---

5. Further, the requirement under section 27.711(12) applies only to private counsel. *See* § 27.710(2), Fla. Stat. (providing that private counsel seeking to become registry counsel for capital postconviction proceedings "must certify on an application provided by the executive director that he or she satisfies the minimum requirements for private counsel set forth in s. 27.704(2)"); § 27.711, Fla. Stat. (setting out duties and limitations of attorney appointed as registry counsel under subsections (2), (8), (9) and (11); addressing payment of fees to private counsel by the Justice Administrative Commission under subsections (3)-(7) and (13); and, under subsection (12), requiring the court to monitor "the performance of assigned counsel to ensure that the capital defendant is receiving quality representation" and ensure registry counsel has not engaged in fraudulent billing, attempted to solicit further compensation from the defendant, failed to "meet continuing legal education requirements," etc.).

- 10 -

that "expressly prohibit capital defendants from raising claims of ineffective assistance of postconviction counsel or otherwise challenging the adequacy of their postconviction representation." *Id.* at 790-91 (citing §§ 27.711(10), .7002(1), (2), Fla. Stat.). We also clarified in *Barwick* that the statutory right to counsel means only that "a defendant be represented by an attorney during postconviction proceedings." *Id.* at 791 (quoting *Asay v. State*, 210 So. 3d 1, 28 (Fla. 2016)). Thus, we denied Barwick's claim, concluding that "a claim of ineffective assistance of postconviction counsel does not provide a valid basis for relief." *Id.*; *see also Jennings v. State*, 422 So. 3d 107, 118 (Fla.), *cert. denied*, 146 S. Ct. 402 (2025).

As to the 2022 amendments and rule 3.112, these sources reflect that postconviction counsel must be *competent*—that is, an attorney meeting minimal requirements to competently handle capital postconviction proceedings. *See In re Amends. to Fla. Rule of Crim. Proc. 3.851*, 351 So. 3d at 575-76 ("[N]ew subdivision (i)(11) provides that collateral counsel must be appointed in cases for which motions under subdivision (i) were granted prior to the effective date of these amendments, i.e., where counsel was

- 11 -

previously discharged.  As always, postconviction counsel must meet the minimum requirements set forth in Florida Rule of Criminal Procedure 3.112 (Minimum Standards for Attorneys in Capital Cases) . . . ."); Fla. R. Crim. P. 3.112(a) ("The purpose of these rules is to set minimum standards for attorneys in capital cases . . . .  Counsel in death penalty cases should be required to perform at the level of an attorney reasonably skilled in the specialized practice of capital representation, zealously committed to the capital case, who has had adequate time and resources for preparation."); Fla. R. Crim. P. 3.112(k) (providing minimum requirements specifically for lead counsel in capital postconviction cases, requiring counsel be a member of a bar in good standing for at least five years, have three years' experience in postconviction litigation, and have handled a combined total of five capital proceedings with at least two in capital postconviction proceedings).

Here, Silvia's statutory right to counsel was satisfied by the appointment of CCRC-M.  CCRC-M is a statutorily created office established for the very purpose of providing competent capital postconviction counsel.  *See* §§ 27.701, .704(1), Fla. Stat. (creating the three CCRC regional divisions to handle capital postconviction

- 12 -

representation; permitting CCRC to appoint full-time assistant counsel to handle postconviction proceedings so long as counsel meets minimum requirements, including participation in "at least five felony jury trials, five felony appeals, or five capital postconviction evidentiary hearings or any combination of at least five of such proceedings").

Thus, Silvia was afforded his statutory right to competent postconviction counsel through the appointment of CCRC-M. And CCRC-M did not cease being competent to handle postconviction proceedings because it was simultaneously representing two defendants under active warrants.

We also rejected a materially similar due process argument to Silvia's in *Barwick*. There, Barwick's due process claim also depended on the recognition of a statutory right to effective assistance of postconviction counsel in order to argue that his due process rights were violated based on the compressed thirty-day warrant schedule. 361 So. 3d at 790. We rejected this claim because Barwick was given notice and an opportunity to be heard. *Id.*

We likewise reject Silvia's due process claim. Silvia was

- 13 -

afforded notice and an opportunity to be heard. And Silvia was appointed competent counsel who accessed the courts on his behalf. *See Zakrzewski v. State*, 415 So. 3d 203, 210 (Fla.) (rejecting claim that death row inmate was deprived access to courts based on thirty-day warrant period overlapping with Fourth of July holiday and pendency of another death row inmate's execution), *cert. denied*, 146 S. Ct. 57 (2025).

And we have repeatedly held that "an expedited warrant litigation schedule does not deprive a defendant of his right to due process." *Jennings*, 422 So. 3d at 119 (citing *Windom v. State*, 416 So. 3d 1140, 1150 (Fla. 2025)); *see also Zakrzewski*, 415 So. 3d at 211 (rejecting claim that expedited process of warrant litigation deprived defendant of his due process rights).

To the extent Silvia challenges the Governor's absolute discretion on when to sign a warrant, this Court has long rejected similar challenges. *Tanzi v. State*, 407 So. 3d 385, 393 (Fla.) (rejecting challenge to timing of death warrant, noting "[w]e have long recognized the Governor's authority and discretion when signing death warrants"), *cert. denied*, 145 S. Ct. 1914 (2025); *Valle v. State*, 70 So. 3d 530, 551-52 (Fla. 2011) (declining to "second-

- 14 -

guess" Governor's discretion in when to sign a warrant (citing *Marek v. State*, 14 So. 3d 985, 998 (Fla. 2009))). We continue to reject Silvia's similar challenge here.

Finally, we find no error in the postconviction court's rejection of Silvia's argument that the timing of the warrant violates his Eighth Amendment right to be free from cruel and unusual punishment, or that a manifest injustice will occur based on the timing of his warrant and Florida's recent executions of the elderly and now of Silvia, who is in a wheelchair. First, these arguments are predicated on Silvia's meritless claim that he was deprived of the effective assistance of postconviction counsel. Second, Silvia waived any collateral attack on his sentence, agreeing on the record in *Silvia II* that he understood he was immediately warrant eligible. *Cf. James v. State*, 404 So. 3d 317, 328 (Fla.) (denying habeas claim, reasoning that "James's effort to introduce recent brain scans to challenge his 2003 postconviction waiver is improper where that waiver was upheld in 2008 based on a finding that the waiver was knowingly, voluntarily, and intelligently made"), *cert. denied*, 145 S. Ct. 1351 (2025). We have also rejected similar arguments based on physical infirmities. *Id.* at 325 ("[W]e agree

- 15 -

with the circuit court that even in light of James's allegations relating to cognitive and physical issues and other hardships, James's death sentence does not constitute cruel and unusual punishment."). Finally, we have declined to excuse a procedural bar based on a claim of manifest injustice related to a physical infirmity. *See Bates v. State*, 416 So. 3d 312, 320 (Fla.) (rejecting request to "excuse the procedural bars and grant . . . relief to avoid a manifest injustice" based on a claim that evidence of organic brain damage was inadequately considered during defendant's second penalty phase; also finding no manifest injustice based on the record and precedent (citing *Owen v. State*, 364 So. 3d 1017, 1026-27 (Fla. 2023); *Dillbeck v. State*, 357 So. 3d 94, 105 (Fla. 2023))), *cert. denied*, 146 S. Ct. 66 (2025).

Accordingly, we affirm the postconviction court's summary denial of claim one.

### Claim 2

On appeal, Silvia focuses on the postconviction court's refusal to conduct an evidentiary hearing on claim two, arguing that this was error given the "documented" shortage of etomidate which, if true, will violate his Fourteenth Amendment rights to equal

protection and due process and result in a manifest injustice if his execution is carried out. Silvia clarifies on appeal that he is <u>not</u> raising a method-of-execution claim under the Eighth Amendment and has no issue with the lethal injection protocol. He also makes no assertion on appeal that he is a member of a suspect class or is being individually discriminated against for equal protection purposes. Instead, he simply wants to investigate whether FDOC has a sufficient, non-expired supply of etomidate so that he will be executed in the same manner as other death row inmates. But ultimately, he suggests that all executions be paused in Florida to carry out this investigation, and, given the alleged shortage, he suggests that FDOC donate its supply of etomidate—a lifesaving drug—to hospitals or medical facilities.

We affirm the postconviction court's denial of this claim without an evidentiary hearing. Silvia's claim based on his fears that his rights might be violated by a possible shortage of, or expired supply of, etomidate by FDOC—based on a pharmaceutical industry report[6] that does not discuss FDOC or its supply of

6. Though citing many articles and reports on appeal, in his motion below, Silvia primarily cited the following online report that

etomidate—is speculative and does not state a sufficient claim warranting an evidentiary hearing. "[A] postconviction court's decision whether to grant an evidentiary hearing on a rule 3.851 motion is ultimately based on written materials before the court," *Jimenez v. State*, 265 So. 3d 462, 474 (Fla. 2018) (quoting *Marek v. State*, 8 So. 3d 1123, 1127 (Fla. 2009)), and "conclusory and speculative allegations are insufficient to warrant an evidentiary hearing," *id.* (citation modified) (affirming postconviction court's summary denial of a speculative claim concerning potential harm from use of etomidate).

Moreover, we recently denied a materially similar claim in *Occhicone v. State*, No. SC2026-1042, 2026 WL 2097359, at *4 (Fla. July 21), *cert. denied*, No. 26-5158, 2026 WL 2164217 (U.S. July 28, 2026), based on the "alleged nationwide shortage of etomidate" and Occhicone's fear that FDOC "will deviate from the protocols . . . and thereby violate his right to equal protection." In rejecting this

---

lists which pharmaceutical manufacturers have etomidate and which are short on supply. *See* American Society of Health-System Pharmacists, *Drug Shortages*, https://www.ashp.org/drug-shortages/current-shortages/drug-shortage-detail.aspx?id=873&loginreturnUrl=SSOCheckOnly (last visited Aug. 5, 2026).

claim, we held that Occhicone's claim was "speculative and foreclosed by this Court's recent decisions addressing materially similar claims." *Id.* (citing *Heath v. State*, 426 So. 3d 1253, 1261-63 (Fla.), *cert. denied*, No. 25-6746, 2026 WL 363902 (U.S. Feb. 10, 2026); *Trotter v. State*, 428 So. 3d 68, 72-76 (Fla.), *cert. denied*, 146 S. Ct. 755 (2026); *King v. State*, No. SC2026-0336, 2026 WL 672101, at *4-6 (Fla. Mar. 10), *cert. denied*, 146 S. Ct. 1802 (2026); *Spencer v. State*, No. SC2026-0880, 2026 WL 1757938, at *4-6 (Fla. June 18), *cert. denied*, No. 25-7648, 2026 WL 1827690 (U.S. June 25, 2026)).

Further, "we have repeatedly recognized that [FDOC] is entitled to the presumption that it will comply with the lethal injection protocol." *Cole v. State*, 392 So. 3d 1054, 1065 (Fla.) (citing *Muhammad v. State*, 132 So. 3d 176, 203 (Fla. 2013)), *cert. denied*, 145 S. Ct. 109 (2024). Silvia fails to overcome this presumption.

As to Silvia's policy arguments suggesting FDOC should donate its supply of etomidate (notwithstanding his suspicions that it is expired), this Court is neither a policymaker, nor is its role to "micromanage the executive branch in fulfilling its own duties

relating to executions." *Valle*, 70 So. 3d at 546 n.16 (quoting *Troy v. State*, 57 So. 3d 828, 840 (Fla. 2011)).

For all the foregoing reasons, we affirm the summary denial of claim two.

## III.

We affirm the summary denial of Silvia's motion for postconviction relief, deny his motion for stay filed in this case, and deny his request for oral argument. No motion for rehearing will be entertained by this Court. The mandate shall issue immediately.

It is so ordered.

COURIEL, C.J., and MUÑIZ, GROSSHANS, FRANCIS, and SASSO, JJ., concur.
LABARGA, J., concurs in result.
TANENBAUM, J., concurs in result with an opinion.

TANENBAUM, J., concurring in result.

The defendant waived his right to collaterally attack his judgment and death sentence. That meant both of those orders became absolutely final and beyond further challenge. Under how this court used to treat collateral attacks on judgments, the trial court at that point would have lost procedural jurisdiction to

- 20 -

consider the claims the defendant now, at the last minute, has tried to raise.  I would affirm on that basis alone.

Earlier this year, I put the modern post-conviction motion into historical perspective, relying heavily on this court's own words. *See Saffold v. State*, 429 So. 3d 424, 435–37 (Fla. 2026) (Tanenbaum, J., concurring); *Willacy v. State*, 431 So. 3d 254, 266–67 (Fla. 2026) (Tanenbaum, J., concurring in part and dissenting in part).  Once an appeal from a judgment and sentence is at an end and those two final orders are affirmed, they become absolutely final, and the trial court loses procedural jurisdiction to modify or vacate the orders.  *See Saffold*, 429 So. 3d at 435 (Tanenbaum, J., concurring) (citing decisions from this court).  Writs of *habeas corpus ad subjiciendum, coram nobis*, and *coram vobis* historically became the only means by which to collaterally attack a criminal judgment and sentence for an error of law or fact.  *See id.*; *see also Willacy*, 431 So. 3d at 266–67 (Tanenbaum, J., concurring in part and dissenting in part).

Key here is that these writs, in the context described, were used to attack the legality of the judgment or sentence itself, not

how the sentence was being implemented once it became final.

Take *coram nobis*.  We once described it as follows:

> The function of a writ of error coram nobis is to bring the attention of the court to a specific fact or facts *then existing* but not shown by the record and not known by the court or by the party or counsel at the trial, and being of such a vital nature that if known to the court in time would have prevented the rendition and entry of the judgment assailed.

*Lamb v. State*, 107 So. 535, 538 (Fla. 1926) (emphasis supplied).

As the highlighted text indicates, to warrant *coram nobis* relief in a criminal case, the defendant had to show by evidence that facts existing *prior* to the judgment—facts that could not have been known by the defendant or counsel despite "the exercise of due diligence"—would have made entry of the judgment legally impossible, had those facts contemporaneously been known.  *Id.* (further describing the requisite unknown, pertinent facts as "existing or having occurred *prior* to the judgment" (emphasis supplied)).  Simply put, *coram nobis* was not available to attack a judgment based on facts occurring *after* its entry.  *Id.* at 539 (noting that the writ has been denied "[w]here the facts or circumstances complained of arose after judgment"); *cf. Cole v. Walker Fertilizer Co., for Use & Benefit of Walker*, 1 So. 2d 864, 867 (Fla. 1941)

(noting, in civil context, that *coram nobis* does not lie based on "facts newly arising after judgment" (quoting 34 C.J. 397)).

We adopted Florida Rules of Criminal Procedure 3.850 and 3.851 to *procedurally* streamline most claims that could be brought under either *habeas* or *coram nobis*. *Cf. Richardson v. State*, 546 So. 2d 1037, 1039 (Fla. 1989); *Wood v. State*, 750 So. 2d 592, 595 (Fla. 1999) (noting similarity between the relief to be obtained under the writ and under rule 3.850); *see generally In re Rule of Crim. Proc. 3.851 (Collateral Relief After Death Sentence Has Been Imposed)*, 626 So. 2d 198, 199 (Fla. 1993) (adopting new rule 3.851 but noting that the "proceedings and grounds for postconviction relief remain as provided under Florida Rule of Criminal Procedure 3.850").

Those rules did not, and could not, create a new, substantive right of action to hold a state officer to account for how he implements a sentence the trial court imposes. Such an action, pursued in a criminal proceeding, makes no sense anyway—there being no corrections officer named as a defendant and subject to the court's jurisdiction. Claims under these rules, in turn, ought not go any further than the writs they replaced. That is, a post-

- 23 -

conviction claim *still* must be focused on whether the judgment or sentence is valid and legal based on facts arising *prior* to their entry.  Indeed, the text in both rules still references vacating the "judgment and sentence"—and not a civil remedy having nothing to do with the validity of those final orders.  Fla. R. Crim. P. 3.850(a); Fla. R. Crim. P. 3.851(d), (e)(1), (2).

In 1990, this court simply ignored its long stretch of decisional history and tradition and "held" that a defendant's rule 3.850 (a precursor to what became the separate rule for death sentences, rule 3.851) claim based on mistakes in the carrying out of another condemned prisoner's otherwise constitutional death sentence was not procedurally barred—with a wink and a nod stating that the "claim rests primarily upon facts which occurred only recently." *Buenoano v. State*, 565 So. 2d 309, 311 (Fla. 1990).  In other words, the court, with no analysis, treated new, *post-judgment* facts as newly discovered evidence that could support an otherwise procedurally barred claim under the post-conviction-relief rules.

Doing this, the court, without authority, effectively expanded the rule's scope to include a new substantive right of action to remedy claimed improper executive function.  It is likely no

coincidence that, after *Buenoano*, this court almost exclusively has cited to federal civil rights cases for the supposed constitutional standard to be applied in these method-of-execution claims brought under rule 3.851, especially to *Glossip v. Gross*, 576 U.S. 863 (2015). *See id.* at 867 (noting that review came in connection with civil rights suit filed under title 42, section 1983, of the United States Code); *see also Asay v. State*, 224 So. 3d 695, 701 (Fla. 2017) (relying on *Glossip* to set out the "condemned prisoner's" burden of proof, based on *current* facts, to challenge the constitutionality of death sentence implementation under rule 3.851); *see generally Baze v. Rees*, 553 U.S. 35 (2008) (review of state declaratory judgment suit against prison officials regarding implementation of death sentences); *Bucklew v. Precythe*, 587 U.S. 119 (2019) (review of method-of-execution challenge brought via civil rights suit under 42 U.S.C. section 1983); *Nelson v. Campbell*, 541 U.S. 637 (2004) (same).

This approach is based on a false equivalency. There is a substantive difference between a federal civil rights action—a statutory action to remedy post-sentence conduct by state officials who are subject to the court's jurisdiction—and a post-conviction

proceeding, which exists as a matter of substantive common-law to challenge the judgment and sentence itself, within the same criminal proceeding brought against the defendant, based on facts pre-dating those orders.

Simply put, absent a statute, this court has no authority to expand rule 3.851's reach to allow the equivalent of a section 1983 suit. Moreover, this court consistently has overlooked the significance of the U.S. Supreme Court's observation that "imposition of the death penalty presupposes a means of carrying it out." *Nelson*, 541 U.S. at 644. A challenge to "a particular means of effectuating a sentence of death does not directly call into question the 'fact' or 'validity' of the sentence itself," because a state could "alter[] its method of execution" and "go forward with the sentence"—meaning such a challenge would be beyond the province of a post-conviction motion. *Id.* To properly challenge a death sentence as illegal, in turn, the post-conviction motion would have to challenge the whole way the State carries out its death sentences, *e.g.*, by challenging the entire statutorily established lethal injection regime as cruel and unusual punishment. *Cf. id.* at

644–45 (suggesting this kind of argument "may amount to a challenge to the fact of the sentence itself").

Of course, lethal injection repeatedly has been held to be an acceptable means of execution, and the defendant does not make such a challenge here. Instead, the defendant's counsel brings forward frivolous claims that have nothing to do with the validity of the judgment and sentence—which the defendant long ago accepted as final when he waived his post-conviction claims.

Until this court returns to how it historically handled post-conviction claims, as described above, we will continue to receive frivolous claims like what we have here, ostensibly under the false justification that "death is different." Rule 3.851(h) is useful to expedite what should be the rare, last-minute challenge to the validity of a judgment and sentence. But too many collateral counsel view it instead as an invitation to file something—anything, even if frivolous—just because the Governor has signed a warrant.

The warrant is supposed to mark the end of the road for a defendant on death row, not the beginning of one last attack on how the State implements its otherwise lawful sentences of death. We should not allow "method of execution" claims to be entertained

under rule 3.851 unless the entire sentencing regime is challenged as being cruel and unusual. The defendant did not assert such a claim below (though he also previously waived it anyway), so the summary denial was warranted, there being no jurisdiction to consider the claims asserted.

An Appeal from the Circuit Court in and for Seminole County,
John D. Galluzzo, Judge – Case No. 592006CF004522A000XX

Eric Pinkard, Capital Collateral Regional Counsel, Ali A. Shakoor, Assistant Capital Collateral Regional Counsel, Debra Roganne Bell, Assistant Capital Collateral Regional Counsel, and Mahham Syed, Assistant Capital Collateral Regional Counsel, Middle Region, Temple Terrace, Florida,

    for Appellant

James Uthmeier, Attorney General, Tallahassee, Florida, Naomi Nichols, Senior Assistant Attorney General, and Doris Meacham, Special Counsel, Assistant Attorney General, Daytona Beach, Florida,

    for Appellee